IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TROY HUDSON, SR.; AUTUMN HUDSON;
KEVIN HUDSON; and TROY HUDSON, JR.,

              Plaintiffs,

     v.

CITY OF SALEM; STATE OF OREGON
DEPARTMENT OF HUMAN SERVICES;
RONNIE ALMBERG of DHS; WALT MYERS,
Salem Chief of Police; WILLIAM BALES, Salem
Police Officer #375; OFFICER WILLIAM
WILTSE, Salem Police Officer #299; OFFICER
ERIC MOFITT, Salem Police Officer #253;
OFFICER SKIP MILLER, Salem Police Officer
#371; OFFICER PAUL HENNINGER, Salem
Police Officer #231; OFFICER LARRY
SHRYLER, Salem Police Officer #126; OFFICER
KRIS WICKMAN, Salem Police Officer #304; and
OFFICER MARK KEAGLE, Salem Police Officer
#368,

              Defendants.

CV-07-226-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiffs are all members of the Hudson family:  Troy Hudson, Sr. (father), Autumn Hudson (mother), and Kevin and Troy Hudson, Jr. (sons, ages 15 and 1 respectively).  At all times relevant to this action, they resided in Polk County, Oregon.  Defendants fall into two categories:  (1) the City of Salem, its police chief, Walt Myers, and eight police offers ("city defendants"); and (2) the Oregon Department of Human Services ("DHS") and its employee Ronnie Almberg ("state defendants").[1]

On February 18, 2005, the City of Salem police searched the Hudson home pursuant to a valid search warrant.  During the course of the search, Mrs. Hudson had a seizure and was taken to the hospital; the state defendants removed the Hudsons' one year old son, Troy Jr., from the home; and Mr. Hudson's 15 year old son, Kevin, voluntarily left to stay at a youth shelter en route to his biological mother.  At the conclusion of the search, the police officers arrested Mr. Hudson and charged him with Criminal Mistreatment in the First Degree.  Mrs. Hudson was later charged by citation.  The charges for both were ultimately dismissed.  The Hudsons allege that during course of that search and the events that followed, defendants violated their rights under the United States Constitution and state common law.

Defendants have moved for summary judgment on all claims (dockets #43 and #48). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons that follows, defendants' motions are GRANTED in part and DENIED in part, leaving only a few claims for trial.

---

[1]  The Hudsons voluntarily dismissed a third category of defendants, consisting of Polk County and Robert Wolfe of the Polk County Sheriff's Office (dockets #25 and #26).

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## FACTS

### I. Investigation and Execution of Search Warrant

In February and March 2005, defendant Detective William Wiltse, was involved in an investigation concerning identity theft and computer-fraud related activity. Wiltse Decl., ¶ 2. This investigation led him to suspect Kevin may have committed a crime. On February 7, 2005, he contacted Mr. Hudson, who permitted him to enter their home and seize and search Kevin's

computer.  Ex. 128(2), p. 11.[2]  Mr. Hudson informed Detective Wiltse that he possessed a

medical marijuana card, and Detective Wiltse later reported he smelled marijuana while in the

home.  Ex. 125.  Mr. Hudson would not consent to a search or seizure of any other computer in

their home.  Ex. 128(2), p. 12.  On February 17, 2005, Detective Wiltse drafted an application

for a search warrant to search the Hudson home for additional evidence of identity theft or

computer fraud crimes.  Wiltse Depo., p. 38; Ex. 128(2).  This affidavit mentions nothing about

the condition of the Hudson home, or the presence or odor of marijuana or marijuana smoke.

The search warrant was signed on February 18, 2005, authorizing the search of the

Hudson home for various items related to the ongoing internet fraud and identity theft

investigation and to seize, among other things, any computers, components of a computer, or

peripheral device.  *Id*, p. 1.  That same day, Detective Wiltse stopped Mr. Hudson in his car near

his residence just prior to arriving at his house.  Wiltse Decl., ¶ 4.  He told Mr. Hudson to return

home where Detective Wiltse read the search warrant and members of the City of Salem Police

Department, including defendant Officers Keagle, Shryler, Henninger, and Wickman, conducted

the search.  *Id*, ¶ 3-4; Petersen Decl. (docket #46), Ex. 101.  All four Hudsons were present at the

time of the search.

At one point, Mr. Hudson overheard Detective Wiltse on the phone saying, "It's not here;

we're not finding it."  *Id*, ¶ 6.  While searching his house, officers opened Mr. Hudson's locked

garage door and discovered his medical marijuana garden which he tends subject to a medical

marijuana permit in its own manufactured room in his garage.  *Id*, ¶ 8.  Police questioning

---

[2]  All references to "Ex.," unless preceded by an additional description, are to plaintiffs' exhibits appended to the declarations of plaintiffs' attorney Brian Michaels or otherwise included in their filings (dockets #60, #63, #86, and #87).  These consist of exhibits 102-42, although two exhibits are numbered 128 and designated by this court as #128(1) and #128(2).

became more aggressive after they discovered the medical marijuana garden.  *Id*, ¶ 9.  Based

upon the presence of a marijuana grow, Officers Moffit and Bales from the Drug Activity

Response Team were contacted.  They arrived at approximately 3:48 p.m.  Wiltse Decl., ¶ 7 &

Ex. A-1.  Mr. Hudson maintains there was no access to, or smell emanating from, the garden

until after the police opened the room which housed it.  Mr. Hudson Decl., ¶ 8.  Even though he

had more plants than allowed under his medical marijuana permit, the police left the garden

intact and did not charge Mr. Hudson for any crime related to it.  Petersen Decl., Ex. 101, p. 6.

The police concluded their search in a little over two hours.  Wiltse Decl., ¶ 6, & Ex. A-1.

No charges were ever brought related to the alleged internet fraud and identity theft that

originally justified the search warrant.  Wiltse Depo., p. 119.  Instead, at the conclusion of the

search, Detective Wiltse arrested Mr. Hudson for the crime of Criminal Mistreatment in the First

Degree, and Officers Bales and Moffit transported him to the Polk County Jail.  Wiltse Decl.,

¶¶ 9-10; Petersen Decl., ¶ 2  & Exs. 101, p. 2 & 102.

## II.    **Detention During Search**

Detective Wiltse contends that he informed Mr. Hudson "in no uncertain terms" that he

was not under arrest and told the Hudsons they were free to leave at any time during the search.

Wiltse Decl., ¶ 4.  According to Officer Wickman, Detective Henninger was assigned to

"maintain visual control" of the Hudsons in the kitchen "for officer safety reasons."  Wickman

Depo., p. 14.

The Hudsons remember things differently.  According to Mr. Hudson, Detective Wiltse

initially told him that he was not under arrest, but that he needed to return home.  Mr. Hudson

Depo., p. 58.  Once there, the Hudsons were ordered to stay in the kitchen while being guarded

at all times by an officer.  Mr. Hudson Decl., ¶ 3.  Mr. Hudson does remember that the officers

told Mrs. Hudson, at one point, that she and the children could leave, but no one was permitted

to leave the kitchen while in the home, and as time went on, they no longer felt free to leave at

all.  Mr. Hudson Depo., p. 87.  No one ever told Mr. Hudson he was free to leave.  *Id*, p. 88.

## III.    **Mrs. Hudson's Seizure and Citation**

Mrs. Hudson suffers from a seizure disorder.  Mr. Hudson Decl., ¶ 8; Mrs. Hudson Depo.

p. 45.  During the search, she began to show signs of seizure activity.  Mr. Hudson Decl., ¶ 8.

Mr. Hudson asked the officers twice if he could get her seizure medication, but his requests were

denied.  Mr. Hudson Decl., ¶ 5; Mr. Hudson Depo., pp. 73-74, 77, 85.  On one of these

occasions, he informed Detective Wiltse that it was past time for both of them to have their

medications, that he was in pain and that his wife "was not looking good."  Mr. Hudson Depo.,

p. 77.  Detective Wiltse responded that they needed to "hold on" and that they would "be

finishing up soon."  *Id*.  Detective Wiltse denied his request even though Mr. Hudson told him

that his wife had a history of seizures and needed her medication.  *Id*, p. 73.  Mr. Hudson

believes Mrs. Hudson also requested her medication twice.  *Id*, p. 85.  About an hour after the

search began, Mr. Hudson noticed his wife begin to shake, and about 30 minutes later asked

Detective Wiltse for permission to obtain their medications, but Detective Wiltse denied that

request.  *Id*, pp. 75, 77.  At about 4:52 p.m., Mrs. Hudson had a seizure causing her to collapse to

the floor.  Wiltse Decl., ¶ 6 & Ex. B.  The officers called for an ambulance which arrived nine

minutes later and transported her to Salem Hospital.  *Id*.

///

///

**IV.**    <u>**Removal of Children**</u>

The day before the search, Detective Wiltse called DHS to report that he had concerns with fraud and pornographic activity and the smell of marijuana in the Hudson home.  Wiltse Depo. pp. 37-38; Almberg Depo., pp. 22-23.  Detective Wiltse notified DHS that the police would be serving a search warrant on the Hudson home and would contact DHS if they felt there were concerns for the children.  Almberg Depo., p. 20.

Caseworker Ronnie Almberg was assigned to the case.  *Id*, p. 19. Almberg reviewed the family's past DHS history which included 11 prior reports of child abuse or neglect.  Almberg Decl., ¶¶ 6-7.  She also learned that Mrs. Hudson had a history of mental health problems, had her parental rights terminated as to one of her children, and had relinquished her parental rights as to another.  *Id*.

During the search of the Hudson home, Detective Wiltse noted a "general filth present on the carpet, bathrooms, and floor" and "was concerned by the presence of cockroaches, one of which was squashed by Mr. Hudson and allowed simply to lie on the floor . . . in an area accessible by Troy [] Jr."  Wiltse Decl., ¶ 8.   Based on his observations, he decided to call DHS because the home's condition was dangerous to Troy Jr.  *Id*.  He notified DHS of his observations and also indicated that he had been to the home in the recent past and the conditions were the same then, if not worse.  Almsberg Depo., p. 30; Ex. 125, p. 2.

///

///

Almberg responded to the call, aware that police were inside the Hudson home pursuant to a search warrant. Almberg Aff., ¶ 8. Her supervisor, Chandra Potter (aka Snyder), and a co-worker, Heather Brown, came with her. *Id*.

Upon entering the Hudson home, Almberg detected the smell of marijuana but was unable to determine whether it came from marijuana smoke. *Id*, ¶ 9. She observed the marijuana garden and had concerns about the Hudson children's access to drugs. *Id*. Mr. Hudson and Almberg agreed the Kevin would voluntarily go live with his biological mother in Texas, and made arrangements for him to stay at a shelter that night until travel arrangements could be made. *Id*, ¶ 12. After investigating the home, Almberg concluded that a legal justification existed for the removal of Troy Jr. *Id*, ¶ 15. Almberg discussed her observations of the home's filthy conditions with the Hudsons and informed them of her decision to take Troy Jr. into protective custody. Almberg Depo. p. 34. In spite of the home's condition, Almberg admits that she noticed no visible physical problems or indications of injury, malnourishment, or neglect with Troy Jr. *Id*, p. 42.

Almberg's supervisor, Potter, also inspected the home and agreed with Almberg's conclusion to remove Troy Jr. Potter Aff., ¶ 3. Potter now states that she has had numerous trainings for marijuana odor recognition, and the odor she smelled upon entering the Hudson home was the strongest odor of marijuana in any residence she has ever encountered in her years of employment of DHS. *Id*, ¶ 5. At the time, however, she could not tell if the smell came from smoke or not. *Id*. In her professional opinion, Troy Jr. was in immediate risk of physical harm in the home and needed to be removed for his safety. *Id*, ¶ 9.

///

8 - OPINION AND ORDER

In contrast to Almberg's and Potter's statements that the smell of marijuana in the Hudson home was overwhelming, several officers who were searching the Hudson home, including Officer Keagle, Officer Wickman, and Detective Wiltse, did not smell, or at least did not recall smelling, and odor of marijuana outside of the room housing the marijuana garden. Keagle Depo., pp. 42, 69-70; Wickman Depo., pp. 20-21; Ex. 118, p. 45, p. 2. (Detective Wiltse's trial testimony). Mr. Hudson did not smoke marijuana during the search. Mr. Hudson Decl., ¶ 11. To the extent that there was any smell of marijuana in the home, Mr. Hudson asserts it was only from the garden and did not spread into the house until after police opened and searched the garage where his garden was located. *Id*, ¶ 8. During the search, Kevin informed Detective Wiltse that his parents smoked their marijuana in a separate room while he watched Troy Jr. Ex. 114; Bales Depo., p. 25. It is not known whether Detective Wiltse relayed this information to Almberg. Mr. Hudson remembers overhearing Detective Wiltse and Almberg discuss charging them with Criminal Mistreatment prior to being informed that they were going to remove Troy Jr. and Kevin. Mr. Hudson Decl., ¶ 12.

## V.    Mr. Hudson's Arrest and Transport to Jail

At the conclusion of the search, Detective Wiltse decided to arrest Mr. Hudson for two counts of Criminal Mistreatment in the First Degree. Wiltse Decl., ¶ 9. Officers Bales and Moffitt handcuffed Mr. Hudson and transported him to the Polk County Jail. *Id*, ¶ 7; Wiltse Depo., pp. 98-99. Mr. Hudson requested that the officers handcuff him in front due to his blood clotting condition. Mr. Hudson Decl., ¶ 14. The officers denied his request and crimped and pinched his right hand in the handcuff. *Id*. He complained that the handcuffs were hurting him, and an officer adjusted them prior to putting him in the car. Mr. Hudson Depo., p. 112. He still

complained that the cuffs were too tight, but they placed him in the car without readjusting them. *Id*.

While being transported to jail, Mr. Hudson complained that he was having problems with his arm and his leg felt overly confined. *Id*, p. 116. He informed the officers that he had a severe blood clotting problem in his right leg and his leg was going numb. *Id*. He asked the officers to stop the car and place his handcuffs in front of him. The officers responded sarcastically, "Just hold on, Buddy, we'll be there soon." *Id*. About halfway between his home in West Salem and the jail in Dallas, Mr Hudson complained that his arm was growing numb and his right leg was completely numb which was not good for his clotting problem. *Id*. He again asked if they would pull over and place the handcuffs in front of him, and they denied his request once again. *Id*, p. 117. They arrived at the jail approximately 15 minutes after departing from the Hudson home. *Id*.

At the jail, Officer Bales completed a Probable Cause Affidavit in support of two counts of Criminal Mistreatment in the First Degree. Bales Depo., pp. 21-27; Ex. 114. On the affidavit, he noted that the Hudson home was in a state of disarray and was unclean and unfit for a child. He reported that the carpet was dirty and stained and had garbage and food particles on it throughout the house. In one room boxes and storage containers were stacked four to five feet high along one wall with three unloaded rifles mixed in. Also in that room was a cabinet drawer two feet off the ground that was unlocked containing a glass marijuana pipe with marijuana residue on it and several portions of partially smoked marijuana cigarettes. There was a 17-plant marijuana grow in the garage that was accessible to 15 year old Kevin who stated that he watched his brother sometimes while his parents smoked marijuana in the next room. Officer

Bales also reported that representatives of DHS did not feel the house was suitable for the children and placed them in protective custody.  Officer Bales later indicated that some of these facts were based on his own independent observations, but others were simply information related to him by Detective Wiltse.  Bales Depo., pp. 23, 25-26.  He denies that he had any involvement in the decision to arrest Mr. Hudson or in deciding to charge him with Criminal Mistreatment.  *Id*, p. 27.

Detective Wiltse later issued Mrs. Hudson a citation for Criminal Mistreatment in the First Degree *in lieu* of an arrest.  Wiltse Decl., ¶ 10.  He made the decision to arrest both Mr. and Mrs. Hudson after Almberg made the decision to remove Troy Jr. from the home.  *Id*, ¶ 9.

## VI.    Troy Jr. in State Custody

After removing Troy Jr. from his home, Almberg took him to the hospital to determine whether he had been exposed to drugs.  A physician examined Troy Jr. "from head to toe" which revealed him "to be well kept and healthy" with "no signs of pain."  Ex. 135, p.1.  He weighed 15 kilograms.  *Id*.  The doctor noted that Troy Jr.'s left eardrum was red and prescribed him antibiotics.  *Id*.  He also noted: "They will follow up through Salem Family Medicine.  Ear recheck in ten days."  *Id*.  An "Emergency Urine Drug Scr[ee]n" came back negative for marijuana exposure.  *Id*, p. 3.  DHS did not take Troy Jr. to a follow-up appointment as indicated by the emergency room physician.  Ex. 122, p.7.

On February 23, 2005, Almberg petitioned the Polk County Juvenile Court to take jurisdiction over Troy Jr., and grant temporary custody to DHS.  Ex. 107.  She completed a petition for both Mr. and Mrs. Hudson.  *Id*.  In her petition related to Mrs. Hudson, Almberg alleged that Troy Jr was within the jurisdiction of the court because of the condition of the

Hudson home and because, among other things, "[t]he child's mother exposes the child to marijuana smoke" (*id*, p. 1) and "has failed to protect the child from marijuana smoke." *Id*, p. 2.

Almberg completed a separate petition for Mr. Hudson which mirrors the allegations concerning the state of the Hudson home and exposure to marijuana, and adds that "[t]he child's father is currently incarcerated and currently unable to parent the child" and has "failed to refrain from criminal activity." *Id*, pp. 4-5.

At her deposition, Almberg testified that she could not recall whether she had the results from the drug screen prior to completing these petitions. Almberg Depo., p. 45. Even if she had known the results of the drug screen prior to filling out this petition, she would still have alleged that both parents failed to protect Troy Jr. from marijuana smoke because "the home smelled excessively of marijuana," leading her to believe he had been exposed to marijuana smoke "regardless of whether it was in his blood system or not." *Id*, p. 48.

Judge Charles Luukinen held a preliminary hearing on February 23, 2005, at which he examined the petitions and a Protective Custody Report and received testimony. Almberg Aff., Ex. A, p. 1. The Hudsons were present at the hearing. *Id*. Judge Luukinen found that shelter care was the least restrictive placement that would adequately protect the safety of Troy Jr. and was in his best interest due to "safety concerns in the home." *Id*. He ordered that "temporary custody of the child [be] granted to DHS, and the child [] not be returned home without prior order of the Court." *Id*, p. 2. There is no evidence that Almberg ever notified the court of the negative drug screen result at any time before or after it issued this order.

Pursuant to the court's order, Almberg placed Troy Jr. in foster care. Troy Jr. had

difficulty in foster care; he struggled with an ear ache, did not eat well, and had nightmares. *Id*,

p. 3; Mrs. Hudson Depo., pp. 31-33. Aware that his foster parents were having difficulty getting

him to eat, Almberg contacted the Hudsons to obtain a list of the foods Troy Jr. liked. Almberg

Aff., ¶ 24; Mrs. Hudson Depo., p. 32. During a supervised visit, the Hudsons noticed a bruise

on Troy Jr., and expressed concern that he was being physically abused. Almberg Aff., ¶ 17;

Mrs. Hudson Depo., p. 31. Almberg inspected the bruise and determined that it was not caused

by abuse. Almberg Aff., ¶ 19. Almberg followed up with the foster parents who said that it

probably happened while Troy Jr. was playing with the other toddlers in their home. *Id*, ¶ 20.

The foster parents had no criminal record or prior allegations of abuse against them. *Id*, ¶ 21.

On March 8, 2005, Judge Luukinen held another hearing concerning Troy Jr.'s

placement. He found that Troy Jr. was "not doing well in his placement." *Id*, Ex. A, p. 3. DHS

advised him that the Hudsons had cleaned up their home and agreed to not smoke marijuana in

the home and requested that Troy Jr. be returned to his parents. *Id*, Ex. A, p. 3. Judge Luukinen

ordered that the February 23, 2005 temporary custody order be continued, but under modified

conditions, including that Troy Jr. would be allowed to reside with his parents in their family

home. *Id*. At that point they had been separated for 18 days.

The next day, the Hudsons brought Troy Jr. in to urgent care to evaluate his continuing

illness and bruises that they perceived to be signs of abuse. Von Ter Stegge Aff., Ex. B, pp. 1-2.

Troy Jr. had lost one-half kilogram of weight, had congestion, a runny nose, raised temperature,

and four bruises of less than one centimeter in diameter on his body. *Id*. The doctor found no

indications of abuse, but encouraged the Hudsons to call their case worker with their concerns. *Id*, p. 2.

**VII.    Disposition of the Charges**

On March 2, 2005, a Grand Jury indicted Mr. and Mrs. Hudson on two counts each of Criminal Mistreatment in the First Degree.  Petersen Decl., Ex. 104.  Detective Wiltse was the only witness for the Grand Jury proceedings.  Ferder Decl., ¶ 8.  At trial, the court dismissed the charges against both Mr. and Mrs. Hudson at the close of the State's case on motion for judgment of acquittal.  *Id*, ¶ 7.

**CLAIMS**

The Complaint alleges nine claims separated into 22 individual counts alleging violations of the Hudsons' legal rights stemming from the February 18, 2005 search of their home and its aftermath.  At oral argument they conceded their Fifth, Eighth, and Ninth claims which are dismissed.  The following claims remain:

First Claim:  This claim seeks recovery for injuries Troy Jr. allegedly suffered while in the custody and care of DHS.  Count 1 alleges a violation of Troy Jr.'s Fourteenth Amendment right to substantive due process pursuant to 42 USC § 1983 ("§ 1983") against Almberg in her individual capacity.  Count 2 alleges the same violations but against DHS on the basis of "municipal liability."  Count 3 alleges common law negligence against both Almberg and DHS.

Second Claim:  This claim seeks to recover for injuries suffered by the Hudsons due to their interference with their familial relationships.  Count 1 alleges a violation of the First and Fourteenth Amendments for "unwanted interference" with the Hudsons' right to familial

association pursuant to § 1983 against all individual defendants.  Count 2 alleges the same against DHS and City of Salem on the basis of municipal liability.

Third Claim:  This claim seeks to recover for the injury suffered by Mrs. Hudson when defendants allegedly denied her medical care during the course of the search.  Count 1 alleges a violation of her Fourteenth Amendment right to substantive due process pursuant to § 1983 against all individual defendants.  Count 2 alleges the same against the City of Salem on the basis of municipal liability.  Count 3 alleges common law negligence by all defendants.

Fourth Claim:   This claim seeks to recover for injuries suffered by Mr. Hudson during the course of his arrest.  Count 1 alleges excessive force in violation of the Fourth Amendment pursuant to § 1983 against all individual defendants other than Almberg.  Count 2 alleges the same against the City of Salem on the basis of municipal liability.  Counts 3 and 4 allege common law negligence and battery against all city defendants.

Sixth Claim:  This claim seeks to recover for injuries suffered by both Mr. and Mrs. Hudson as a result of their allegedly improper arrests.  Count 1 alleges a violation of their Fourth Amendment right to be free from unreasonable seizure pursuant to § 1983  against all individual defendants other than Almberg.  Count 2 alleges the same against the City of Salem on the basis of municipal liability.

Seventh Claim:  This claim seeks to recover for injuries suffered by the Hudsons due to the illegal search and seizure.  Count 1 alleges a violation of their Fourth Amendment right to be free from unreasonable search and seizure against all individual defendants.  Count 2 alleges the same against the City of Salem and DHS on the basis of municipal liability.  Count 3 alleges common law trespass against all defendants.

**DISCUSSION**

I.    **City Defendants' Motion (docket #43)**

    A.    **§ 1983 Liability**

The city defendants move for summary judgment on all claims asserted against the individual police officers and the City of Salem.  The Hudsons' claims against the city defendants can be broadly separated into three categories.  First, they allege various violations of their constitutional rights actionable pursuant to § 1983 by the individual defendants.  Second, they allege that the City of Salem is liable for those violations through the doctrine of municipal liability.  Third, they allege that all city defendants are liable for a variety of state common-law claims.

Pursuant to § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law . . . ."  Consequently, to establish a § 1983 violation, a party must establish that the alleged conduct was committed by a person acting under color of state law and violated a right secured by the Constitution or laws of the United States.  *See Humphries v. County of Los Angeles*, 554 F3d 1170, 1184 (9th Cir 2009).  There is no dispute that the city defendants in this action (or any other individual defendant) acted "under color" of state law.  The parties dispute whether any of the Hudsons' constitutional rights were violated.

A state actor's liability under § 1983 is predicated on his "integral participation" in the alleged violation.  *Chuman v. Wright*, 76 F3d 292, 294-95 (9th Cir 1996).  This standard "does

not require that each officer's actions themselves rise to the level of a constitutional violation," *Boyd v. Benton County*, 374 F3d 773, 780 (9th Cir 2004), but does require "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F3d 463, 481 n12 (9th Cir 2007). There is no vicarious liability under § 1983 because "[l]iability . . . must be based on the personal involvement of the defendant." *Barran v. Harrington*, 152 F3d 1193, 1194 (9th Cir 1998), *cert denied*, 525 US 1154 (1999).

**B.      Qualified Immunity**

Even if an officer violated one of the Hudsons' constitutional rights, that officer may still be protected from liability pursuant to the doctrine of qualified immunity where the "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 US 800, 818 (1982). Until recently this required a rigid two-part inquiry, in which the court first assessed whether there was any constitutional violation at all, and then determined whether that constitutional right was "clearly established" at the time of the officer's conduct. *See Saucier v. Katz*, 533 US 194, 201-02 (2001). Recently, the Supreme Court replaced *Saucier's* "rigid order of battle" with a more flexible rule which permits courts to address whether a right was clearly established before, or in place of, concluding that right was violated. *Pearson v. Callahan*, 129 S Ct 808, 818 (Jan. 21, 2009). Courts may still follow the two-step analysis where it is helpful. Because this court finds it helpful, it will generally follow this analysis in addressing each individual claim.

///

///

///

C.     **Analysis of Claims**

      1.     **Interference with Familial Relations (Second Claim)**

This claim is based upon the removal of Troy Jr. from the home.  Because this decision was made solely by Almberg, there was no personal participation by any city defendant. Therefore, the city defendants' motion is granted with respect to the Second Claim in its entirety.

      2.     **Denial of Medical Care (Third Claim)**

This claim is based upon the alleged denial of Mr. and Mrs. Hudson's request to obtain Mrs. Hudson's medication and the seizure she allegedly suffered as a result of its denial. Mrs. Hudson alleges that the city defendants violated her Fourteenth Amendment right to substantive due process by denying her requests to take her medication while she was confined to the kitchen during the course of the police search.

The city defendants asserts that the officers owed Mrs. Hudson no duty because she was never in police custody.  Indeed, Mrs. Hudson admits that early during the search, she was told that she was free to leave.  However, at some point a non-custody situation arguably morphed into one in which Mrs. Hudson was not permitted to leave her kitchen.  There is no dispute that certain officers actually prevented Mrs. Hudson from gaining access to her medication when she needed it.  Nevertheless, it is not of great importance whether Mrs. Hudson was in custody for purposes of establishing a duty to provide her medical care because, as discussed below, the officers did not violate that duty.

///

///

///

18 - OPINION AND ORDER

a.    **Legal Standards**

A person detained in police custody has a constitutionally protected right to receive needed medical care protected by the substantive due process clause of the Fourteenth Amendment.  *See City of Revere v. Mass. Gen. Hosp.*, 463 US 239, 244-45 (1983); *Carnell v. Grimm*, 74 F3d 977, 979 (1996); *Jones v. Johnson*, 781 F2d 769 (1986).  The Ninth Circuit has adopted the Eighth Amendment standard for providing necessary medical care to prisoners as a "minimum standard of care" for determining the rights of a pretrial detainee to the same.  *Jones*, 781 F2d at 771.  Under this standard, "persons in custody [have] the established right to not have officials remain deliberately indifferent to their serious medical needs."  *Carnell*, 74 F3d at 979.  Deliberate indifference is established when a detainee shows that "the official knew of and disregarded a substantial risk of serious harm to his health or safety."  *Johnson v. Meltzer*, 134 F3d 1393, 1398 (9th Cir), *cert denied*, 525 US 840 (1998), citing *Farmer v. Brennan*, 511 US 825, 837 (1994).  In contrast, "[m]ere negligence in the provision of medical care . . . does not constitute a constitutional violation."  *Frost v. Agnos*, 152 F3d 1124, 1130 (9th Cir 1998) (citation omitted).

The Hudsons assert that because their claim is brought pursuant to the Fourteenth Amendment, a more liberal standard of liability protects their rights than under the Eighth Amendment.  They urge this court to adopt the standard set forth in *Oregon Advocacy Center v. Mink*, 322 F3d 1101, 1121 (9th Cir 2003) ("*OAC*"), and *Jones v. Blanas*, 393 F3d 918, 932 (9th Cir 2004), *cert denied*, 546 US 820 (2005).  Both of those cases primarily concern conditions of confinement suffered by incapacitated defendants, as in *OAC*, or those awaiting civil commitment proceedings, as in *Jones*.  Both cases concluded that deliberate indifference, as

defined under the Eighth Amendment in analogous contexts, was not the appropriate standard for measuring the defendants' conduct.  In *OAC*, to judge a due process violation, the court applied a balancing test which weighed the plaintiff's liberty interests in freedom from incarceration and restorative treatment against the legitimate interest of the state.  *OAC*, 322 F3d at 1121.  In *Jones*, the court adopted the standard developed by the Supreme Court for judging whether pre-trial detainees' due process rights were violated by their conditions of confinement, concluding that individual in custody while awaiting civil commitment proceedings cannot be subjected to conditions of confinement that "amount to punishment."  *Jones*, 393 F3d at 932, *citing Bell v. Wolfish*, 441 US 520, 536 (1979).

These cases are distinguishable because both involved individuals who were incarcerated by the state and subjected to the restrictive conditions of jail for an extended period of time.  The Hudsons, in contrast, were in the kitchen of their own home for no more than two hours.  Neither *OAC* nor *Jones* addressed the standards that apply to the behavior of police officers with respect to persons in putative police custody but not yet under arrest.  The Ninth Circuit indicated no intent in either *OAC* or *Jones* to overturn the standards applied in the more analogous situation of persons in police custody, such as *Carnell* and *Johnson*.

This court does, however, recognize that the Eighth Amendment deliberate indifference standard is only a minimum standard, and that the Hudsons are entitled to even greater protections under the Fourteenth Amendment.  However, under any conceivable due process standard, Mrs. Hudson cannot show that the city defendants denied her due process by refusing her access to her medication while concluding the search.

///

**b.**    <u>**Analysis**</u>

Dispatch records show that officers began their search of the Hudson home at 3:05 p.m. Wiltse Decl, Ex. A-1.  Mrs. Hudson's seizure was reported to dispatch at 4:52 p.m.  *Id*.  After about an hour from the start of the search, Mr. Hudson noticed his wife had started to shake.  It was another 30 minutes before he asked Detective Wiltse for permission to retrieve their medications.  Detective Wiltse responded to his requests by telling them "to hold on" because they would "be finishing up soon."  Mr. Hudson Depo., p. 77.  Thus, at most, Detective Wiltse denied Mrs. Hudson access to her medicine for 20 to 30 minutes before she had her seizure.  The Hudsons have presented no evidence that Detective Wiltse knew or should have known that denying Mrs. Hudson access to her medication would cause her to have a seizure in such a short period of time.  At the most, Detective Wiltse failed to exercise reasonable care in his treatment of Mrs. Hudson's medication requests.  Mere negligence by government officials is insufficient to establish a substantive due process violation in this or any other context.  *Daniels v. Williams*, 474 US 327, 328 (1986).

When it became apparent that Mrs. Hudson was in need of immediate medical services, the city defendants provided them, thus fully complying with the requirements of the Fourteenth Amendment.  *See City of Revere*, 463 US at 245. ("Whatever the standard may be, Revere fulfilled its constitutional obligation by seeing that Kivlin was taken promptly to a hospital that provided the treatment necessary for his injury.").  The undisputed facts of this case simply do not support a finding of deliberate indifference or any level of constitutional wrongdoing.  Accordingly, summary judgment is granted in favor of the officers as to Count 1 of the Third Claim.

### 3.    <u>Excessive Force (Fourth Claim)</u>

This claim arises out of the handcuffing and transportation of Mr. Hudson to the jail at the end of the search.        At the outset, only Officers Moffitt and Bales were involved in handcuffing Mr. Hudson.  There is a question of fact as to which officer initially handcuffed him, but both officers were aware of his discomfort and requests for readjustment on the way to the jail.  Because no other officers participated in his handcuffing, the city defendants' motion is granted with respect to this claim except as to Officers Moffitt and Bales.

### a.    <u>Legal Standards</u>

A claim for excessive force pursuant to the Fourth Amendment is analyzed  under the objective reasonableness standard set forth in *Graham v. Connor,* 490 US 386, 396 (1989).  Under this standard "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id* (internal quotations, citations omitted).   In conducting this inquiry, this court must " pay 'careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Meredith v. Erath*, 342 F3d 1057, 1061 (9th Cir 2003) (alterations in original), quoting *Graham*, 490 US at 396.

The Ninth Circuit has applied this standard to claims of excessive force in handcuffing and controlling suspects on multiple occasions.  *See Winterrowd v. Nelson*, 480 F3d 1181, 1184 (9th Cir 2007); *Wall v. County of Orange*, 364 F3d 1107, 1112 (9th Cir 2004); *Meridith,* 342 F3d

22 - OPINION AND ORDER

at 1061 (9th Cir 2003); *LaLonde v. County of Riverside*, 204 F3d 947, 960 (9th Cir 2000); *Palmer v. Sanderson*, 9 F3d 1433, 1436 (9th Cir 1993); and *Hansen v. Black*, 885 F2d 642, 645 (9th Cir 1989).  These cases demonstrate that very few facts are necessary to preclude summary judgment in favor of a government official on a qualified immunity defense again a claim of excessive force.

### b.    <u>Constitutional Violation</u>

Mr. Hudson asserts that the officers used unreasonable force by refusing  to accommodate his blood clotting problems by handcuffing his arms in front, rather than behind. He states the tightness of the cuffs and the position of his arms caused him arm and leg pain and made his right arm and leg go numb.  He further stated that at least twice, he asked them to pull over and place his handcuffs in front because he was in a lot of pain and numbness was bad for his clotting problem.  Instead of acknowledging and honoring his request, he was subjected to sarcasm.

The city defendants respond that any amount of discomfort Mr. Hudson felt only lasted for the 15-minute drive from his home to the jail.  The officers had already adjusted his handcuffs once before putting him in the car, and according to Mr. Hudson's deposition, only the position of the handcuffs caused him discomfort, not the tightness.  They assert that handcuffing a person behind his back is a reasonable measure to assure officer safety and that no reasonable officer would have believed they were violating a clearly established right by refusing to handcuff him in front.  Finally, they point out that Mr. Hudson had no complaints about arm or leg numbness or pain when he was booked in to the Polk County Jail.  *See* Petersen Supp. Decl. (docket #72), Exs. 109-11.  According to the city defendants, the level of discomfort experienced

by Mr. Hudson is exactly the kind of "insubstantial claim" the Supreme Court posited in *Saucier* would be amenable to summary judgment despite some question of fact as to whether the plaintiff actually suffered some level harm.  *Id*, 533 US at 202.

Looking at the evidence in the light most favorable to Mr. Hudson, a reasonable juror could find his Fourth Amendment rights violated.  Mr. Hudson informed police prior to being placed him in the police car that he suffered blood clotting problems and that having his arms handcuffed behind his back would cause him pain.  His request fell on deaf ears.  As a result, he was subjected to at least 15 minutes of pain in his arms and legs.  The nature and quality of the invasion certainly was not as severe as some of the cases discussed above, but, by his account, was not insubstantial.

With respect to the government's interest in the amount of force used, Officers Moffit and Bales have failed to present any justification for intentionally placing him in any amount of pain during the ride to the jail when a less harmful option was readily available.  At no time during the course of the search of his home was he hostile or uncooperative.  He was not arrested for a violent act.  The officers have articulated no single fact showing that he posed a danger to officer safety while in transit to Polk County Jail.  In short, he was subjected to pain and numbness in his arms and legs for the duration of the car ride that could have been easily alleviated with no increased risk of danger to officer safety.  The fact that the booking form records no complaints of arm or leg pain weighs heavily against Mr. Hudson's credibility, but that is a matter for a jury to consider.  *See Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986) (reiterating that "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n] he is ruling on a motion for summary judgment").

c.    **Clearly Established Law**

Since a reasonable jury could find that Officers Moffit and Bales violated Mr. Hudson's Fourth Amendment right to be free of excessive force, the next issue is whether those officers are entitled to qualified immunity because the law was not clearly established at the time such that a reasonable officer would have known the use of force here was excessive. *Winterrowd*, 480 F3d at 1186. The Supreme Court has emphasized that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 US 194, 198 (2004) (citation omitted). "[R]easonableness is judged against the backdrop of the law at the time of the conduct[,]" and this analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id* (citation, quotation omitted). "In excessive force cases, the inquiry remains whether, 'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful and [whether] any mistake to the contrary would have been unreasonable." *Boyd*, 374 F3d at 781, quoting *Drummond v. City of Anaheim*, 343 F3d 1052, 1060 (9th Cir 2003) (emphasis is original).

According to multiple Ninth Circuit cases decided by February 2005, causing a person pain through the method and manner of handcuffing, and failing to respond to reasonable requests to change the position of handcuffs, without justification, can expose an officer to liability under § 1983. *See Wall*, 364 F3d at 1111-12; *Meredith*, 342 F3d at 1061; *LaLonde*, 204 F3d at 960; *Palmer*, 9 F3d at 1436; and *Hansen*, 885 F2d at 645. Nevertheless, the city

defendants argue no reasonable officer could have specifically known that handcuffing a suspect behind their backs for a 15-minute car ride would violate his constitutional rights.

The Ninth Circuit has rejected such a narrow approach, noting that an "injured party 'need not establish that the Defendants' behavior had been previously declared unconstitutional,'" *Care Partners, LLC v. Lashway*, 545 F3d 867, 882 (9th Cir 2008), *petition for cert filed*, No. 08-1023 (Feb 9, 2009), quoting *Hydrick v. Hunter*, 500 F3d 978, 989 (9th Cir 2007).  *See also Wall*, 364 F3d at 1111 ("This requirement does not mean that the very action at issue must have been held unlawful before qualified immunity is shed.")  Instead, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 US at 202.

At the time of Mr. Hudsons' arrest,  "[i]t [wa]s well-established that overly tight handcuffing [could] constitute excessive force."  *Wall*, 364 F3d at 1112, citing *Meredith*, 342 F3d at 1061, and *Lalonde*, 204 F3d at 960.  Contrary to the city defendants' argument, Mr. Hudson *is* claiming that his handcuffs were too tight when placed into the police car, causing him pain.  A reasonable juror could find that this constituted excessive force.

In addition, with respect to handcuffing behind the back, a reasonable jury could conclude that a reasonable officer would have known that leaving a non-threatening suspect handcuffed in a position with knowledge that it was causing pain also constituted excessive force.  The common theme in the Ninth Circuit cases is that an officer is not entitled to cause a suspect unnecessary pain when less intrusive methods of gaining compliance are available.  For example, in *Winterrowd*, the court held that police seeking to pat down a suspect could not do so

in a manner that caused him pain when the suspect posed no immediate threat to the police and other means were available. *Id*, 480 F3d at 1186 ("No reasonable officer would believe he could constitutionally force a harmless motorist against the hood of a car and cause him unnecessary pain." (citation omitted)).

As in *Winterrowd*, Mr. Hudson informed officers of specific health problems which rendered a certain posture painful. Despite this knowledge, the officers handcuffed him in that painful position without any basis for believing that he would pose a threat to officer safety with his hands handcuffed in front. A reasonable officer would have known that causing Mr. Hudson unnecessary pain, even for 15 minutes, violated his constitutional right to be free from excessive force. *See Blankenhorn*, 485 F3d at 481 ("force is only justified when there is a need for force."). Thus, the city defendant's motion for summary judgment is denied as to Count 1 of the Fourth Claim as to Officers Bales and Moffit.

### 4.    False Arrest (Sixth Claim)

The Sixth Claim alleges that the city defendants arrested both Mr. and Mrs. Hudson without probable cause to believe they had committed any crime. Summary Judgment is granted with respect to Mrs. Hudson's claim, as she was never arrested. Her novel argument that merely being cited and given a court date constituted an arrest is simply wrong.

Mr. Hudson seeks to hold every officer at the Hudson home responsible for his arrest. Detective Wiltse acknowledges Mr. Hudson's arrest was his decision. Wiltse Decl., ¶ 9. His name is listed as the arresting officer on the Probable Cause Affidavit completed by Officer Bales. Ex. 114, p. 1. The only other officers who appear to have been involved in the arrest were Officers Moffit and Bales who handcuffed and transported Mr. Hudson to the jail.

Additionally, Officer Bales completed the probable cause affidavit which included some

information he gleaned from his own observations of the Hudson home.  Thus, only these three

officers may be liable for any constitutional violation stemming from Mr. Hudson's unlawful

arrest.  *See Blankenhorn*, 485 F3d at 481 n12 ("[I]ntegral participation does not require that each

officer's actions themselves rise to the level of a constitutional violation . . . [, b]ut it does

require some fundamental involvement in the conduct that allegedly caused the violation." )

(internal citation, quotations omitted).  Other than these three officers, Mr. Hudson has provided

no evidence linking any other officers to the decision to arrest him.  Thus, summary judgment is

granted to the other officers on the Sixth Claim.

a.    <u>Legal Standards</u>

Mr. Hudson alleges that he was arrested without probable cause for two counts of

Criminal Mistreatment in the First Degree, one count for each of his two children.  "The fourth

amendment to the United States Constitution, applicable to the states through the fourteenth

amendment, prohibits arrests without probable cause."  *McKenzie v. Lamb*, 738 F2d 1005, 1007

(9th Cir 1984) (citation omitted).  "An arrest without probable cause violates the Fourth

Amendment and gives rise to a claim for damages under § 1983."  *Harper v. City of Los Angeles*,

533 F3d 1010, 1022 (9th Cir 2008), citing *McKenzie*, 738 F2d at 1007.

Probable cause exists when "'at the moment of arrest the facts and circumstances within

the knowledge of the arresting officers and of which they had reasonably trustworthy

information were sufficient to warrant a prudent [person] in believing that the petitioner had

committed or was committing an offense.'"  *Blankenhorn*, 485 F3d at 471, quoting *U.S. v.

Jensen*, 425 F3d 698, 704 (9th Cir 2005).  Oregon uses a similar standard. ORS 131.005(11) ("

'Probable cause' means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it.").

When assessing probable cause, the court must look to "the totality of the circumstances known to the arresting officer, [to determine if] a prudent person would have concluded there was a fair probability that [the defendant] had committed a crime." *John v. City of El Monte*, 515 F3d 936, 940 (9th Cir 2008) (alterations in original), quoting *U.S. v. Smith*, 790 F2d 789, 792 (9th Cir 1986). "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." *Id*, citing *U.S. v. Lopez*, 482 F3d 1067, 1072 (9th Cir 2007). The court makes this determination "based upon the information the officer had at the time of making the arrest" and not on "hindsight analysis." *Id*, citing *Devenpeck v. Alford*, 543 US 146, 152 (2004).

Although the existence of probable cause is a highly fact-dependent issue, "whether a reasonable officer could have believed probable cause . . . existed to justify . . . an arrest is 'an essentially legal question' that should be determined by the district court at the earliest possible point in the litigation." *Peng v. Mei Chin Penghu*, 335 F3d 970, 979 (9th Cir 2003), *cert denied*, 540 US 1218 (2004), quoting *Act Up!/Portland v. Bagley*, 988 F2d 868, 873 (9th Cir 1993). "Thus, where the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for this court to decide whether probable cause existed at the time [Detective Wiltse] arrested [Mr. Hudson]." *Id* at 979-80.

The city defendants assert two bases for summary judgment: either probable cause actually existed or the later grand jury indictment provides conclusive proof of probable cause.

///

### b. **Probable Cause**

Based on the facts known to the officers at the time of Mr. Hudson's arrest, a reasonable jury could conclude that they lacked probable cause to arrest Mr. Hudson.  Under Oregon law, Criminal Mistreatment in the First Degree is a Class C Felony with the following elements:

> (1) A person commits the crime of criminal mistreatment in the first degree if:
>
> (a) The person, in violation of a legal duty to provide care for another person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of another person, intentionally or knowingly withholds necessary and adequate food, physical care or medical attention from that other person; or
>
> (b) The person, in violation of a legal duty to provide care for a dependent person or elderly person, or having assumed the permanent or temporary care, custody or responsibility for the supervision of a dependent person or elderly person, intentionally or knowingly:
>
>> (A) Causes physical injury or injuries to the dependent person or elderly person; . . .

ORS 163.205 (2005).

With no evidence that the Hudson children lacked "necessary and adequate food" or "medical attention" or that Mr. Hudson caused them "physical injury," the officers must be relying upon a lack of "physical care" as establishing a violation.  At least one Oregon court has defined "physical care" as including "attention to the safety or well being of the body.  That attention necessarily includes attention to dangers in the body's environment."  *State v. Damofle*,

89 Or App 620, 624, 750 P2d 518, 521, *rev denied*, 305 Or 671, 757 P2d 421 (1988) (construing

ORS 163.200, Criminal Mistreatment in the Second Degree).

The city defendants contend that the condition of the Hudson home was sufficient to

establish probable cause due to its filthiness, the presence of overloaded electrical outlets,

chemicals on the floor of the garage, and the pervasive odor of marijuana. They also seek to

cobble together every piece of available evidence in the record, including post-arrest

developments, in an effort to demonstrate that Detective Wiltse had probable cause to make the

arrest. Many of the factors cited, such as later actions by the juvenile court, are simply

irrelevant.

According to Detective Wiltse, he made the decision to call DHS "based upon the filth in

the home" which was present "on the carpet, bathrooms, and floor." Wiltse Decl., ¶ 8. This filth

included the presence of cockroaches, one of which he observed Mr. Hudson smash and leave

lying on the floor. *Id*. The probable cause affidavit completed by Officer Bales generally

reflects the same concerns regarding the condition of the Hudson home. Petersen Decl., Ex. 103.

Additionally, Detective Wiltse asserts he relied upon Almberg's decision to remove Troy Jr.

from the home, further affirming to him that the condition of the home posed a danger to Troy Jr.

Wiltse Decl., ¶ 9.

The Hudsons respond by submitting photographs purporting to show the condition of the

home at the time of the search. These photographs show a dirty home, but do not necessarily

demonstrate the level of filth suggested by Detective Wiltse. The Hudsons also blame much of

the mess pictured in the photographs on the actions of the police in searching the home. They

further argue that there was no indication that Troy Jr. was in any danger, pointing out that

Detective Wiltse had been in the home previously, and although, as he later reported to DHS, it had been in the same or worse condition then, he did not arrest Mr. Hudson for Criminal Mistreatment or seek a warrant for his arrest on this basis.

A reasonable jury viewing this evidence could conclude that Detective Wiltse lacked probable cause to arrest Mr. Hudson for Criminal Mistreatment in the First Degree.  First, the statute requires that the conduct of Mr. Hudson have been knowing or intentional.  Detective Wiltse has articulated no evidence supporting the required *mens rea* of Criminal Mistreatment in the First Degree.  *See* ORS 161.085(7) (defining "intentionally" as acting "with a conscious objective to cause the result or to engage in the conduct so described") and ORS 161.085(8) (defining "knowingly" as acting "with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists.").  Absent some evidence of intentional or knowing conduct, he lacked probable cause to arrest Mr. Hudson for the crime of Criminal Mistreatment in the First Degree.  Moreover, the condition of the home was not nearly as bad as that described in *Damofle* which upheld a conviction for Criminal Mistreatment in the *Second Degree* under the lesser *scienter* of criminal negligence.[3]  A reasonable jury could conclude that

---

[3] In *Damofle*, the alleged conditions of the defendant's home were:

 1.) it was cold and wet inside; 2.) it was musty and had an overwhelming stench; 3.) a 3-lb coffee can was being used as a toilet and was full of urine. There were no barriers around the urine nor anything to prevent the two toddlers from getting to it; 4.) near the can of urine (almost on top of it) were various items such as crackers and formula; 5.) there was ground glass in the carpet at the entrance to the room; 6.) there were sacks of garbage everywhere with flies buzzing around; 7.) there was [sic] ground-in food crumbs in living area and flies everywhere; 8.) clothing, dirty diapers, and garbage were strewn all over living area; 9.) dirty dishes were sitting on the floor and were in sacks on the floor; 10.) baby bottles with sour contents were on the floor; 11.) there was a gasoline container, partially filled near the entrance [and] it smelled like gasoline); 12.) the two children who could walk were running around in underwear barefoot; 13.) there were matches within easy reach of the children; 14.) the clothing for the children which was strewn around the living area was smelly and wet as were the blankets on the beds.

*Id*, 89 Or App at 622, 750 P2d at 519.

the condition of the Hudson home did not provide Detective Wiltse with any basis for believing Criminal Mistreatment in the Second Degree had been committed, much less Criminal Mistreatment in the First Degree.

Almberg's decision to remove Troy Jr. does not compel a different result.  As discussed further below, Almberg's decision to remove Troy Jr. is questionable.  Additionally, her decision was entirely distinct from Detective Wiltse's probable cause determination.  Her decision to remove Troy Jr. sheds no light on the mental state of Mr. Hudson, an essential element of the crime with which he was charged.  Finally, an issue of fact exists as to whether Detective Wiltse made the decision to arrest Mr. Hudson before or after Almberg decided to remove Troy Jr.  With conflicting testimony on this point, it is impossible to conclude as a matter of law that part of the basis of Detective Wiltse's decision to arrest Mr. Hudsons was Almberg's decision to remove the child from the home.

### c.    Effect of Grand Jury Indictment

The parties dispute what effect the issuance of an indictment has on the analysis.  The city defendants assert that it is conclusive proof of probable cause, citing *Reed v. City of Chicago*, 867 F Supp 714, 720 (ND Ill 1994), *aff'd on other grounds*, 77 F3d 1049 (7th Cir 1996), *rehearing denied.*  That case held that probable cause was established by the plaintiff's grand jury indictment, despite the plaintiff's later acquittal.

The Hudsons assert that their claim is valid on two separate theories.  First, they claim that the cause of action for false arrest accrued at the time of Mr. Hudson's arrest, and the lack of probable cause at that time cannot be cured by a later grand jury indictment.  Second, they assert that the indictment itself was improper, muting any curative effect it could have, citing *Harris v.*

*Roderick*, 126 F3d 1189, 1198 (1997), *cert denied*, 522 US 1115 (1998), and *Hart v. Parks*, 450 F3d 1059, 1070 (9th Cir 2006). *Harris* discussed the principle that an indictment procured through perjured testimony does not, in some circumstances, shield officers from charges that they violated a plaintiff's constitutional rights in conducting an investigation and seeking criminal prosecution. *Hart* pointed out that while a grand jury indictment could demonstrate probable cause, that conclusion could be challenged by showing that the indictment was procured through false testimony.

None of the cases cited by the parties are particularly helpful here, and this court has found no Ninth Circuit or Oregon case directly on point. Some circuits addressing this issue have concluded that an after-the-fact grand jury indictment cannot provide probable cause for an earlier arrest. *See McClellan v. Smith*, 439 F3d 137, 145 (2nd Cir 2006) (because under New York law a grand jury indictment did not provide a presumption of probable cause for an earlier arrest, the district court erred in dismissing the plaintiff's false arrest claim);[4] *Jones v. Cannon*, 174 F3d 1271, 1285 n8 (11th Cir 1999) ("a subsequent grand jury indictment does not retroactively provide probable cause for a false arrest that had already taken place"), citing *Garmon v. Lumpkin County, Ga.*, 878 F2d 1406, 1409 (11th Cir 1989); *Radvansky v. City of Olmsted Falls*, 395 F3d 291, 307 n13 (6th Cir 2005) ("after-the-fact grand jury involvement cannot serve to validate a prior arrest"); *Joseph v. Kimple*, 343 F Supp2d 1196, 1202 (SD Ga) ("a subsequent indictment does not absolve the officer from liability for an initial false arrest made without any arguable probable cause"), *aff'd*, 391 F3d 1276 (11th Cir, 2004). Other cases hold

---

[4] *But see Bernard v. United States*, 25 F3d 98, 104 (2nd Cir 1994) (finding that "[i]n New York, the fact that the Grand Jury returned an indictment against Bernard creates a presumption that his arrest and indictment were procured with probable cause.").

that a subsequent grand jury indictment does provide affirmative evidence of probable cause for

an earlier arrest which may be rebutted by evidence that the indictment was procured through

fraudulent or corrupt means. *See Taylor v. Gregg,* 36 F3d 453, 456-57 (5th Cir 1994); *Gatter v.*

*Zappile*, 67 F Supp2d 515, 519-20 (ED Pa 1999), *aff'd*, 225 F3d 648 (3rd Cir 2000); *Villescaz v.*

*City of Eloy*, 2008 WL 4277943, *7 (D Ariz Sept 18, 2008).

Under Oregon law, an indictment in a malicious prosecution action "is merely some

evidence of probable cause" which a plaintiff may overcome by presenting other evidence, and is

no evidence of probable cause where there is evidence of fraud or misrepresentation in its

procurement. *Lampos v. Bazar, Inc.*, 270 Or 256, 272, 527 P2d 376, 383 (1974). If this is all the

weight Oregon law affords a grand jury indictment for the actions of prosecutors or others in

bringing a criminal claim, it is logical that its retroactive effect is even less. Thus, this court

concludes that in the case of false arrest, a later indictment on the same charges does not suffice

to conclusively establish probable cause at the time of the arrest.

This conclusion is bolstered here by several facts. First, the only evidence the grand jury

considered was Detective Wiltse's testimony. The photographs submitted to this court were not

submitted to the grand jury and cast doubt on the degree of disarray in the Hudson home.

Additionally, as pointed out by the Hudsons, Detective Wiltse's explanations of the conditions

of the Hudson home have been inconsistent. He was in the home 10 days prior to the search

under conditions which he described as being as bad or worse than its condition at the time of the

search, yet did not arrest Mr. Hudson then. Given these circumstances, the fact that the grand

jury found sufficient evidence to indict Mr. Hudson solely on Detective Wiltse's testimony sheds

little light on whether probable cause to arrest him existed in the first place.

Because this court cannot find as a matter of law that a reasonable officer would have believed probable cause existed to arrest Mr. Hudson for a crime, the officers' motion for summary judgment is denied as to Count 1 of the Sixth Claim by Mr. Hudson.

///

///

### 5.    <u>Unreasonable Search of Hudson Home (Seventh Claim)</u>

The final constitutional claim alleges that the city defendants violated the Hudsons' Fourth Amendment right, applicable to the states through the Fourteenth Amendment, to be free from unreasonable searches and seizures by remaining in the Hudson home past the time necessary to carry out the search authorized by the search warrant.  The Hudsons do not challenge the sufficiency of the warrant itself, only the manner in which the search was carried out.  They allege that the officers impermissibly exceeded the scope of the search when they expanded beyond searching for evidence of identity theft and computer crime to investigating the marijuana grow and possible child neglect.  They also allege that two hours was an unreasonable amount of time to conduct a search for evidence of a computer crime.

Here all officers who participated in the search may be held liable as "each officer involved in the search operation was an 'integral participant'" in the search by actively assisting in carrying it out.  *Boyd*, 374 F3d at 780.

### a.    <u>Legal Standards</u>

The Fourth Amendment proscribes "unreasonable" searches and seizures.  A search may be unreasonable based "not only on *when* it was made, but also on *how* it is carried out."  *Franklin v. Foxworth*, 31 F3d 873, 876 (9th Cir 1994) (emphasis in original), citing *Tennessee v.*

*Garner*, 471 US 1, 7-8 (1985) (emphasis in original).  Thus, a search that is otherwise legally

justified "may be invalid if carried out in an *unreasonable* fashion."  *Franklin*, 31 F3d at 875 (9th

Cir 1994).  The reasonableness of the manner of a search is determined under an objective test,

looking at the facts and circumstances confronting the officers.  *Id.*

///

> **b.**    **Analysis**

Looking at the totality of the circumstances, a reasonable juror could not conclude that

two hours is an unreasonable amount of time to search of an entire house for items as small

computer storage devices, such as "thumb drives."  The search warrant authorized the police to

search for a wide variety of computer equipment, including central processing units, internal and

peripheral storage devices, input/output devices, system documentation, software and instruction

manuals, among other things.  Spending no more than two hours to search every possible place

in a home that any one of these devices could be found is a sufficiently short period of time as to

be reasonable as a matter of law.

In the course of searching the entire house for items as small as portable storage devices,

the officers came across a substantial marijuana grow in the garage and became concerned about

the condition of the home.  They then called in other officers with expertise in addressing these

specific problems.  The Hudsons have failed to present any case law demonstrating that this was

in error.[5]  Because the conduct of the officers was reasonable under the totality of the

circumstances, summary judgment is granted on Count 1 of the Seventh Claim.

---

[5]  Despite the Hudsons' assertions at oral argument that the initial search had concluded in one hour, nothing in the record shows at what point the officers concluded looking for the items listed in the search warrant.  Instead, it appears that all search activities were being carried on nearly simultaneously.

**D.** **Municipal Liability**

The Hudsons seek to hold the City of Salem liable for the unconstitutional conduct of its officers. The City of Salem argues that each of these claims must fail because the Hudsons have failed to "identify a municipal 'policy' or 'custom' that caused [them] injury." *Board of County Comm'rs v. Brown*, 520 US 397, 403 (1997). The City of Salem may not be held liable "solely because it employs a tortfeasor." *Id*. The Hudsons may prove such a policy or custom exists under one of three theories: (1) a City of Salem employee committed the alleged violation pursuant to a formal policy, practice, or custom constituting the city's standard operating procedure; (2) an official with final policy-making authority committed the constitutional tort, making the challenged action itself an act of official government policy; or (3) an official with final policy-making authority ratified a subordinate's unconstitutional action and the basis for it. *Trevino v. Gates*, 99 F3d 911, 918 (9th Cir 1996), *cert denied*, 520 US 1117 (1997); *Gillette v. Delmore*, 979 F2d 1342, 1346-47 (9th Cir 1992)*, cert denied,* 510 US 932 (1993).

The Hudsons argue that the City of Salem had a policy of allowing police officers to illegally initiate an action to remove a child from their home simply because it was untidy and contained a legal marijuana grow. But other than this case, they have provided no evidence of such a general policy. Therefore, this argument fails.

Alternatively, they argue that the City of Salem delegated policymaking authority by its failure to have a formal policy governing, or provide any type of training concerning, the investigation of medical marijuana grows. These arguments also fail. As to the former argument, the Hudsons have presented no evidence that the City of Salem delegated policymaking authority to individual police officers. *See Jett v. Dallas Indep. Sch. Dist.*, 491 US

701, 737 (1989) (noting that the issue of who is a policy maker is a question of state law to be

determined by "[r]eviewing the relevant legal materials, including state and local positive law, as

well as custom or usage having the force of law") (citation, quotations omitted).

As to the latter argument, the Hudsons must show that the failure to train amounted to

deliberate indifference which, in turn, requires proof that the City of Salem was on actual or

constructive notice that its failure to train would likely result in a constitutional violation. *See*

*Gibson v. County of Washoe, Nev.*, 290 F3d 1175, 1186 (9th Cir 2002).  The Hudsons have

presented no evidence that the City of Salem was on notice that a failure to train its police

officers on the proper methods of investigating medical marijuana grows would lead to the types

of constitutional violations they allege.  For that matter, the Hudsons have failed to present any

evidence whatsoever concerning the City of Salem's training policies or lack thereof. *See Boyd*,

374 F3d at 784 ("[Plaintiff] cannot survive summary judgment on her *Monell* claim by simply

relying on the lack of a written policy.").

Accordingly, summary judgment is granted with respect to the City of Salem on all

constitutional claims, namely Count 2 in the Second, Third, Fourth, Sixth and Seventh Claims.

### E.    Supervisor Liability

The Hudsons also seek to hold Police Chief Myers liable for the conduct of his officers.

He may be held liable only "for his own culpable action or inaction in the training, supervision,

or control of his subordinates; for his acquiescence in the constitutional deprivation[;] or for

conduct that showed a reckless or callous indifference to the rights of others." *Blankenhorn*, 485

F3d at 485 (citations, quotations omitted).  The Hudsons have presented no evidence concerning

Chief Myers' actions or inactions to conclude that he bears any responsibility for the actions of

the police officers in this case.  *See, e.g.*, *id* (exemplifying the evidence sufficient to create an issue of fact on supervisor liability).  Thus, Chief Myers is granted summary judgment on all claims against him.

///

///

### F.    Tort Claims

To the extent that this court has denied summary judgment for a constitutional claim, the related state law claims will survive summary judgment. With respect to the city defendants, this means that the negligence and battery claims (Fourth Claim, Counts 3 and 4) alleged against Officers Bales and Moffit, the only officers involved in handcuffing Mr. Hudson, survive summary judgment.  The City of Salem also is named a defendant on these claims, but the parties have not directly addressed the basis of its potential liability.  Thus, absent further submissions by the parties, this claim remains viable.

Similarly, the parties have not directly addressed the negligence claim alleged as Count 3 of the Third Claim for the city defendants' failure to permit Mrs. Hudson to take her medication. Although the conduct does not rise to the level of a constitutional violation, it may still constitute negligence.  Thus, absent further submissions by the parties, this claim also remains viable.

Finally, with respect to the trespass claim alleged as Count 3 of the Seventh Claim, it is black letter law than an entry onto a person's land pursuant to a valid court order is privileged and not subject to an action in trespass.  *See* RESTATEMENTS (SECOND) TORTS, § 210.  Thus, this claim does not survive summary judgment.

///

///

///

///

///

///

## II.    <u>State Defendants' Motion (docket #48)</u>

The Hudsons seek to hold the state defendants accountable for all actions pertaining to Almberg's removal of Troy Jr. from the Hudson home, his treatment while in foster care, and for the denial of medical care to Mr. and Mrs. Hudson.[6]

### A.    <u>Sovereign Immunity</u>

The state defendants move for the substitution of the State of Oregon for Almberg for all claims premised on Oregon law on the basis of the Oregon Tort Claims Act ("OTCA").  The OTCA provides that the "sole cause of action for any tort of officers, employees or agents of a public body acting within the scope of their employment or duties . . . shall be an action against the public body only."  ORS 30.265(1); *see Demaray v. Dep't of Env. Qual.*, 127 Or App 494, 502, 873 P2d 403, 409 (1994).  Based on this statute, the State of Oregon must be substituted for Almberg on the tort claims.

As the proper party, the State of Oregon moves for summary judgment against the common law claims asserted against the State of Oregon for the allegedly tortious conduct of Almberg on the grounds of sovereign immunity.  *Seminole Tribe of Florida v. Florida*, 517 US 44, 54 (1996).  The Hudsons concede that these claims must be dismissed due to the state's

---

[6]  The Complaint also implicates DHS, and not Almberg, in the unreasonable search and seizure of the Hudson home (Fourth Claim) which appears due to a scrivener's error.

refusal to consent to federal jurisdiction over state law claims in this court.  Therefore, Count 3 of the First and Third Claims are dismissed.

The Hudsons also assert multiple claims against DHS, ostensibly under a municipal liability theory.  DHS is a state instrumentality and not a municipality.  It is protected from suit in federal court by Eleventh Amendment.  *Savage v. Glendale Union High Sch.*, 343 F3d 1036, 1040 (9th Cir 2003) ("It is well established that agencies of the state are immune under the Eleventh Amendment from private damages or suits for injunctive relief brought in federal court."); *Thompson v. City of Los Angeles*, 885 F2d 1439 (9th Cir 1989) (same).  Therefore, Counts 2 of the First and Second Claims and Count 3 of the First Claim also must be dismissed.

### B.    **Personal Involvement**

As previously noted, "[l]iability under § 1983 must be based on the personal involvement of the defendant."  *Barran*, 152 F3d at 1194 (9th Cir 1998).  There is no evidence that Almberg was involved in the decision to provide or deny medical care to Mr. or Mrs. Hudson or was involved in the decisions concerning the search of the Hudson home.  She did enter the Hudson home at the request of police officers executing a valid search warrant and was lawfully on the premises.  But there is no evidence that her presence affected the manner or duration of the search or that she played any role in directing the search activities.  Thus, summary judgment is granted as to Almberg on the Third and Seventh Claims.

### C.    **Qualified Immunity**

The leaves only two remaining viable claims against Almburg:  First Claim, Count 1, alleging a substantive due process violation on behalf of Troy Jr. due to neglect and abuse allegedly suffered while in the custody and care of DHS; and Second Claim, Count 1, alleging a

substantive due process violation on behalf due to Almburg's interference with the Hudsons' familial relations.

These claims are brought under § 1983.  Since Almberg was a government actor performing discretionary duties, she is shielded from § 1983 liability unless her conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 US at 818.

### 1.    Interference with Familial Relations (Second Claim)

### a.    Constitutional Violation

"Parents and children have a well-elaborated constitutional right to live together without governmental interference."  *Wallis v. Spencer*, 202 F3d 1126, 1136 (9th Cir 2000) (citing cases). This right is "an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency."  *Id* (citing cases).[7]  The emergency exception is a limited one.  Removal of a child from the custody of his or her parent without prior judicial authorization is authorized "*only if* the information [the officials] possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."  *Id* at 1138 (emphasis added).   Under this test, summary judgment is improper if a material question of fact exists on whether:  (1) reasonable cause existed to believe that Troy Jr. faced an immediate threat of serious physical injury or death; or (2) the actions taken by Almberg "exceeded the

---

[7]  As the person seized, Troy Jr's claim is analyzed under the Fourth Amendment, whereas the rest of the family's claims are analyzed under the Fourteenth Amendment.  *Wallis*, 202 F3d at 1137, n8.  Since the standards are the same for both, the claims will be analyzed together.  *Id*.

permissible scope of the action necessary to protect [him] from that immediate threat." *Id*. "The existence of reasonable cause, and the related questions, are all questions of fact to be determined by the jury" and summary judgment must be denied unless "it is clear that no reasonable jury could conclude that the [Hudsons'] rights were violated." *Id*.

The Hudsons assert that Almberg violated their constitutional right to familial relations in three ways:  (1) by removing Troy Jr. without a warrant or sufficient justification; (2) by misrepresenting facts to the juvenile court judge in order to obtain temporary custody of Troy Jr.; and (3) by failing to return Troy Jr. home sooner when it was clear he was not doing well in foster care.

### i.      Removal of Troy Jr.

In her declaration, Almberg cites the unsafe condition of the Hudson home and the fact that the Hudsons were being arrested as justifications for removing Troy Jr. without a warrant. Neither of these justifications withstands scrutiny.

In an affidavit submitted in support of the state defendants' motion, Almberg lists seven reasons she felt the condition of the Hudson home presented a serious threat to Troy Jr.'s physical safety:  (1) a very strong odor of marijuana was in the home, causing her concern that Troy Jr. may have been exposed to marijuana smoke; (2) dog hair was all over the edges of the floor; (3) the house was in an unsanitary condition, especially the floor where Troy Jr. would crawl; (4) piles of clothing were in the bedroom; (5) Troy Jr. appeared to lack a sleeping area due to his mattress being covered in clothing; (6) the electrical outlets were overloaded; and (7) many small objects were on the floor that presented a choking hazard.  Almberg Aff., ¶ 15.

Almberg has admitted, however, that Troy Jr. looked well-nourished with no signs of physical abuse or neglect. Almberg Depo., p. 42.

The Hudsons contest each of these enumerated "problems" by submitting photographs of their home at the time of the search. Def's Ex. 106. They also assert that one of the reasons for their home's disheveled state was the fact that police officers had been thoroughly searching it for over an hour by the time Almberg arrived. The photographs do reveal that the house was in a state of disarray, but do not demonstrate a level of squalor posing an imminent risk of injury to Troy Jr. under Ninth Circuit law.

In *Rogers v. County of San Joaquin*, 487 F3d 1288 (9th Cir 2007), the Ninth Circuit reversed the grant of qualified immunity to a social worker who removed two children from their home without a warrant. When investigating a complaint of child neglect, the social worker and supporting officers observed the following conditions: one of the children, age three, was locked in her room during the night; the other child, age five, was still in diapers; the older child had severe bottle rot in his mouth and multiple teeth were missing while the remaining showed signs of decay; the children had multiple circular bruises on their legs, had unkempt hair and were thin and pale; piles of dirty dishes and an overflowing garbage receptacle were in the kitchen, and piles of dirty clothing were scattered about the kitchen, living room and bedrooms; the children had dirty bedding and slept on mattresses without frames; a substance that appeared to be feces was smeared on the wall; rat droppings were on the floor; one of the police officers observed what he thought was vomit in the bottom drawer of a night stand; and the father kept a loaded gun in the dresser next to his bed. *Id* at 1291-93. The social worker decided to remove the children due to the living conditions which she believed posed an imminent risk to the children's

physical safety. *Id* at 1293. She returned the children less than three weeks later after their parents made changes to their home and lifestyle and complied with other conditions imposed by child protective services.

Despite its allegedly deplorable, unsanitary condition, the Ninth Circuit held that the condition of the house did not present an imminent risk of serious bodily harm sufficient to justify removing the children without first obtaining a warrant. *Id* at 1295. The court's analysis focused particularly on the modifier "imminent," stating: "Officials, including social workers, who remove a child from [his or her] home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Id* at 1294. The court found that the facts that one of the children's teeth were rotting and the children appeared malnourished was insufficient to justify immediate removal because there was no indication that their condition would have deteriorated precipitously in the time period it took to obtain a warrant. Further, no imminent risk of serious bodily harm was posed by the youngest child being locked her room at night and both children being locked in a room at their parent's place of employment during the day. Similarly, the unsanitary condition of the home appeared to be "a chronic, ongoing problem" and the "presence of disorderliness and a small amount of droppings, feces, and other matter may increase the risk of eventual illness," but did not show that the children "would become seriously ill during the few hours that it would [have taken the social worker] to obtain a warrant." *Id* at 1295-96. The court also found a lack of exigency indicated by the fact that child protective services had delayed in investigating the case for several weeks after it had received a report complaining the parents' neglect. *Id*.

Based on *Rogers*, none of the conditions observed by Almsberg show that Troy Jr. was at imminent risk of serious harm. Even assuming that it would have taken longer then a few hours to obtain a warrant (a fact not addressed by the state defendants), there is no reason to believe that Troy Jr. would have come to harm due to a messy home, some small objects on the floor, dog hair, or overloaded electrical outlets.

The only factor concerning the condition of the Hudson home that could possibly support the exigency exception is the purported presence of an overwhelming odor of marijuana. However, issues of fact remain as to whether such an odor was present in the living area of the home and posed a risk to Troy Jr. When Almsberg arrived, the marijuana grow had already been discovered and opened up. The Hudsons claim that any smell of marijuana in their home was due to the smell of growing marijuana in the garage that diffused through the house during the search. There was no evidence that marijuana had been smoked in their house at any time during the two-hour search, and Kevin had informed Detective Wiltse that when the Hudsons smoked marijuana, they did so in a separate room while he watched Troy Jr. Also, despite Almsberg's claim that the smell was overwhelming, and her supervisor's claim that it was the strongest odor of marijuana in any residence she had ever been into, several of the officers, including one who was an drug interdiction specialist, do not recall whether they smelled marijuana outside of the marijuana grow in the Hudsons' garage. While the probable cause affidavit in support of  the arrest of Mr. Hudson on charges of Criminal Mistreatment in the First Degree discloses the presence of a marijuana grow and drug paraphernalia in the home, it does not indicate whether the home smelled like marijuana smoke or allege that Mr. Hudson had exposed Troy Jr. to marijuana smoke.

In any event, both Almsberg and Potter admit they could not tell whether the smell was from marijuana smoke or marijuana plants. The state defendants do not claim that Troy Jr. could have been injured by exposure to the smell of a growing marijuana plant. Although a child suffering continued exposure to the second-hand smoke of an illicit drug would conceivably support a finding of exigency, the facts in the record do not provide any basis for believing that this had occurred. Nothing in the record indicates that either Almsberg or any other person questioned the Hudsons whether they smoked marijuana in front of Troy Jr., and Almsberg admits that she removed Troy Jr. before determining whether he had been exposed to marijuana smoke. Almberg Depo., p. 39.

In light of the conflicting evidence in the record, an issue of fact exists as to whether the Hudson home smelled of marijuana smoke. The general assertion that the home smelled like marijuana, even if true, is insufficient to show that Troy Jr. was in imminent danger of physical harm. The evidence shows that Troy Jr. had, in fact, not been exposed to marijuana, casting further doubt on the contentions of Almsberg and her supervisor.

Finally, as in *Rogers*, DHS had advance notice of some of the problems with the Hudson home prior to Almberg's investigation and did not immediately seek to remove the children. In particular, Detective Wiltse's report to DHS, made sometime between his initial consensual search on February 7 and the execution of the search warrant on February 17, 2005, noted the smell of marijuana. Ex. 125, p.1. Despite this smell, Detective Wiltse reported he did not know if he had enough evidence for probable cause to obtain a search warrant. *Id*. Later, he reported to Almsberg that the condition of the house was the same if not worse on February 7 as it was on February 17. *Id*, p. 2. The fact that DHS was willing to leave Troy Jr. in a home, despite a

report that the home smelled of marijuana, casts doubt on Almberg's claim that the smell of marijuana created exigent circumstances sufficient to excuse her from the requirement that she obtain a warrant. *See Rogers*, 487 F3d at 1296 ("Our conclusion that no exigency existed here is also supported by the fact that the Child Protective Services delayed in investigating the case and in removing the children."), citing *Calabretta v. Floyd*, 189 F3d 808, 813 (9th Cir 1999) (holding that a 14-day delay in entering a family home to investigate a report of child abuse was evidence of a lack of exigency). If the smell of marijuana were adequate grounds for removing Troy Jr., then DHS had plenty of time to apply for a warrant on that basis. Thus, a reasonable jury could conclude that the condition of the Hudson home did not provide sufficient exigency to justify a warrantless seizure and removal of Troy Jr.

Notwithstanding the condition of the home, Almberg argues that the absence of anyone remaining in home to watch and care for Troy Jr. alone provides sufficient justification to excuse her failure to apply for a warrant. When she decided to remove Troy Jr., Almberg claims that she had been told that both Mr. and Mrs. Hudson were going to be arrested and knew that Kevin was leaving to a youth shelter on his way to stay with his mother. Because Troy Jr. would have been left unsupervised, he would have faced an imminent risk of physical injury if not taken into state custody immediately.

For purposes of this motion, the courts assumes that if left home alone, Troy Jr. would have faced an imminent risk of physical injury and that removing Troy Jr. to state custody was the most reasonable choice for Almsberg to make upon concluding she should remove him. Even so, the evidence of what Almberg knew is sufficiently ambiguous to deny her summary judgment on this point.

It is only the information possessed at the time of the seizure that can provide the basis

for an exigency justification.  *Wallis*, 202 F3d at 1138.  *Post hoc* rationalization will not suffice.

The first indication the Almsberg's decision to remove Troy Jr. was based upon the arrest of the

Hudsons comes in her declaration to support her motion asserting:  "At the time Troy Jr. was

removed from the Hudson home, I was told by a Salem police officer present at the scene that

the police were going to arrest Mr. and Mrs. Hudson."  Almberg Decl., ¶ 10.  She continues:

"Had I not taken Troy Jr. into protective custody, he would have been unsupervised in the

house."  *Id*.

The Hudsons challenge this declaration as "exceedingly self-serving."  They correctly

point out that Almberg did not mention the arrest of the Hudsons as one of her purported

justifications for removing Troy Jr. anywhere in her deposition or in any of the other discovery

taken in this case.  Almberg replies that she was never specifically asked this question or asked

to provide an exhaustive list of the reasons she had for removing Troy Jr.

Some of Almberg's deposition testimony allows a reasonable inference that she did not

know that Mr. and Mrs. Hudson would be arrested for criminal mistreatment.  For example,

when asked whether she followed up to see if any charges were brought related to the original

purpose of the search (identity theft), she testified that:  "I followed up in the fact that I knew

that Mr. Hudson had been arrested for criminal mistreatment and Autumn had been cited with

that as well."  Almberg Depo., p. 88.  Because neither of these events occurred until after

Almberg left with Troy Jr., this statement can be read to imply that Almberg did not know of

either of these facts at the time she decided to remove Troy Jr.  Another example is when she

was questioned about her reasons for sending Kevin to live with his mother:

> So what were was [*sic*] your reasons for putting him into protective
> custody if he didn't go to Texas?
> A:  At that point, we determined that the house was unsafe.
> Q:  And what about the house was unsafe for a 15-year-old?
> A:  Well, at the time of this incident, the home was being investigated for
> fraud and pornography and being searched by the police, and we were
> removing Troy, Jr.  We were not going to leave Kevin, a 15-year-old, in
> the middle of all that, not knowing whether the parents were going to be
> arrested or what was going to happen from that point forward.

*Id*, p. 87.

Read in the light most favorable to the Hudsons, this testimony also implies that Almberg
decided to remove Troy Jr. prior to determining whether either Hudson parent was going to be
arrested.

An additional factor casting doubt on Almberg's declaration is Detective Wiltse's
statement that he made the decision to arrest the Hudsons on the basis of, and only after,
Almberg's decision to remove Troy Jr. because of the condition of the Hudson home.  Wiltse
Supp. Decl., ¶ 9; Petersen Decl., Ex. 101.  If his decision to arrest the Hudsons was based on her
decision to remove Troy Jr., then Almberg's decision to remove Troy Jr. cannot be based on
Detective Wiltse's decision to arrest the Hudsons.

Finally, the fact that Mrs. Hudson later had a seizure can have no bearing on the issue of
whether, at the time of Troy Jr.'s removal, sufficient exigencies existed to excuse Almberg from
seeking a warrant.  First, a favorable interpretation of the evidence shows that Almberg left prior
to learning that *either* parent would be arrested.  Second, assuming she somehow knew that
Mr. Hudson would be arrested, Almberg certainly did not know Mrs. Hudson would suffer a
seizure at the time she decided to remove Troy Jr., and this subsequent fortuity cannot excuse an
unconstitutional action.

Looking at the record in the light most favorable to the Hudsons, issues of fact concern the existence of reasonable cause to remove Troy Jr.

### ii.    <u>Misrepresentations to the Court</u>

The Hudsons also point to fact issues as to whether Almberg made affirmative misrepresentations when she petitioned for temporary custody of Troy Jr. They focus on Almberg's statement in the dependency petition that "the child's mother exposes the child to marijuana smoke." Defs' Ex. 107. An identical assertion appears in the petition pertaining to Mr. Hudson. *Id.* The Hudsons argue that this statement was obviously false because Almberg has admitted she had no idea whether the substance she smelled was burning or growing marijuana. Second, they argue that Almberg should have known that Troy Jr. had not been exposed to marijuana based on the results of his emergency drug test.

Almberg responds that even though she did not know the origin of the smell she observed, she believes it *could have* been from marijuana smoke which justifies her statement to the court. She also disavows having knowledge of the drug test prior to filling out the petition.

An issue of fact exists regarding the extent of Almberg's knowledge concerning the presence of marijuana smoke. By her own admission, Almberg did not know whether the Hudsons did, in fact, expose Troy Jr. to marijuana smoke. While the Hudsons have not provided affirmative evidence showing when Almberg received the results of the drug test, the medical records show that the drug test was conducted the same day she removed Troy Jr.. The medical report by the ER doctor interpreting the results was dictated the next day and transcribed on February 20. Almberg completed her petition for, and the court awarded temporary custody of, Troy Jr. on February 23. It is reasonable to infer that Almberg would not have prepared her

petition without first obtaining the results of the very test she requested due to her suspicion that Troy Jr. had been exposed or, at a minimum, amending her petition after receiving those test results. A jury could find her testimony is not credible on this point.

Even assuming that Almberg did not know the results of the test does not help her case. The Hudsons' right to be free from state interference in their family relationships without due process cannot to be casually disregarded. The Supreme Court has recognized that the liberty interests parents have in "the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 US 57, 65 (2000). To swear to the court that the Hudsons had exposed Troy Jr. to marijuana based solely on an unconfirmed suspicion is inherently misleading and shows a callous disregard for the Hudsons' constitutional rights.

On these facts, a reasonable jury could find that Almberg intentionally misled the court or that her failure to confirm her suspicions with available data prior to declaring the Hudsons' guilt showed a conscious disregard and deliberate indifference to the Hudson's right to be free from state interference in their familial relations.[8] As another court has observed, "'there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.' Likewise, making false statements in a dependency petition with the intent that the court rely on it, causing the parents so lose temporarily lose custody, seriously infringes on a parent's constitutional rights.'" *Hadelman v. Golden*, 2008 WL 1732966, *14 (D Ha April 15, 2008) (internal citation omitted),

---

[8] Based on the evidence submitted by the parties, this court is skeptical of the factual basis for several of the other assertions in Almberg's petition. Because the parties have presented arguments only on the allegation of marijuana exposure, this court has limited its analysis of the petition to that issue.

quoting *Deveraux v. Abbey*, 263 F3d 1070, 1074-75 (9th Cir 2001). This court agrees and

concludes that an issue of fact exists as to whether Almberg misrepresented information to the

court in seeking temporary custody of Troy Jr, thus precluding summary judgment on this

portion of the Hudsons' claim.

///

///

### iii.    Reasonable Scope of Removal

Finally, the Hudsons argue that even accepting as true Almberg's purported justifications

for removing Troy Jr., the length of time Troy Jr. was removed was excessive in light of the

exigency which allegedly justified his warrantless removal. The scope and degree of the

intrusion justified by the emergency exception is "'strictly circumscribed by the exigency that

justifie[s]'" the intrusion to begin with. *Wallis*, 202 F3d at 1141, quoting *Good v. Dauphin

County Social Servs. for Children and Youth*, 891 F2d 1087, 1093 (3rd Cir 1989). "Merely

because *some* intrusion on a child's protected privacy and security interests may be reasonable

does not mean that *any* intrusion is." *Id* at 1140 (emphasis in original).

Almberg is protected by absolute immunity for the period of time Troy Jr. was in state

custody pursuant to a court order. *See Mabe v. San Bernardino County, Dep't of Soc. Servs.*,

237 F3d 1101, 1109 (9th Cir 2001) (social worker entitled to absolute immunity when acting

pursuant to a court order). Additionally, during this time the Hudsons had legal representation,

and nothing indicates that they were unable to petition the court for the return of Troy Jr. to their

custody at an earlier date.

Almberg is not protected by this immunity for the five days that Troy Jr. was in state custody prior to being brought before the juvenile court.  When a child is removed without a warrant pursuant to the exigency exception, the scope of the removal is limited to that "necessary to protect [the child] from that immediate threat."  *Wallis*, 202 F3d at 1138.  A jury could conclude that five days far exceeds the time necessary to clean a dirty home or for the odor of marijuana to dissipate.

///

### b.  <u>Clearly Established Law</u>

Having concluded the evidence is sufficient to prove that Almberg violated the Hudsons' constitutional rights, the next issue is whether Almberg has qualified immunity because a reasonable social worker would not have known that her actions violated this right.  *See Rogers*, 487 F3d at 1296-97.

The constitutional principles governing the exigency exception to removing a child from a parent's home without a warrant was clearly established when Almberg removed Troy Jr.  *See Wallis*, 202 F3d at 1138.  A reasonable social worker would have known that Troy Jr. was not at sufficient risk of *imminent* serious harm to excuse the constitutional requirement that a social worker first obtain a warrant or court order before interfering with the Hudsons' right to familial association.  Additionally, no reasonable social worker could have believed that misrepresenting facts in a court petition in order to obtain the removal of a child from this parents was constitutionally benign.  Finally, as to the length of the removal, a reasonable social worker would have known that keeping a child away from his parents for a time more than necessary to remedy the exigency that allegedly justified his removal was also unconstitutional.  *Id*.

Because a reasonable jury could conclude that a reasonable social worker would have known that her actions violated the Hudsons' clearly established right to familial association, Almberg's motion for summary judgment is denied as to Count 1 of the Second Claim.

///

///

///

///

### 2.      Treatment While in Foster Care (First Claim)

#### a.      Legal Standards

The parties agree that Troy Jr. has a "well established" liberty interest in his own bodily security.  *See Kennedy v. Ridgefield City*, 439 F3d 1055, 1061 (9th Cir) ("*Ridgefield*"), *denying pet. for rehr'g en banc*, 440 F3d 1091 (2006) (citing cases).  Indeed, the Supreme Court has recognized "that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause."  *Youngberg v. Romeo*, 457 US 307, 315 (1982) (citation omitted).  The Hudsons argue that Almburg violated Troy Jr.'s right to bodily security by placing him an unsafe foster home environment, by failing to remove him when it became apparent his health was deteriorating, and by failing to provide Troy Jr. access to needed medical care.  As a result, Troy Jr. allegedly suffered injury at the hands of his foster parents due to an unnecessarily prolonged illness.

It is well established that "members of the public have no constitutional right to sue state actors who fail to protect them from harm inflicted by third parties . . . ."  *Johnson v. City of Seattle*, 474 F3d 634, 639 (9th Cir 2007) (citation omitted).  This rule was established in

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 US 189 (1989), where the Supreme Court observed that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id* at 195.  While the clause does "forbid[] the State itself to deprive individuals of life, liberty, or property without 'due process of law,' . . . its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id*.

Courts recognize two exceptions this bright-line rule.  The "special relationship" exception applies where a state actor abuses a special state-created relationship with an individual, such as in the case of custody or involuntary hospitalization.  *Morgan v. Gonzales*, 495 F3d 1084, 1093(9th Cir 2007), *cert denied*, 128 S Ct 1290 (2008), citing *L.W. v. Grubbs*, 974 F2d 119, 121 (9th Cir 1992), *cert denied*, 508 US 951 (1993).  This exception recognizes that individuals have a constitutionally protected right to some minimal level of care and protection where the government's affirmative acts have restricted an individuals ability to act to care for themselves.  *DeShaney*, 489 US at 199.  The second exception is the "danger creation exception," under which "state actors may be held liable where they affirmatively place an individual in danger by acting with deliberate indifference to a known or obvious danger in subjecting the plaintiff to it." *Ridgefield*, 439 F3d at 1062 (internal citations, quotations, and brackets omitted); *see also Huffman v. County of Los Angeles*, 147 F3d 1054, 1059 (9th Cir 1998), *cert denied*, 526 US 1038 (1999).  Here it is the government's creation of a danger to which the plaintiff would not otherwise have been exposed that creates a duty for the government to protect when not otherwise required.  *See Grubbs*, 974 F2d at 121.

*DeShaney* held that the social workers and local officials had no affirmative duty to protect the child (Joshua) from abuse by his father despite receiving complaints that he was being abused.  Even though "the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  *DeShaney*, 489 US at 201.  The Supreme Court posited, however, that "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id* at 201 n9 (citing cases in the foster care context which had found such an analogy, but declining to comment on their merits).

Multiple courts, drawing from the analogies suggested in *DeShaney*, have held that such an affirmative duty does exist when a state acts to remove a child from his home and place him in foster care.  The Second, Third, Sixth, Seventh, Eighth, Tenth and Eleventh Circuits all have recognized that "foster children have a substantive due process right to be free from harm at the hands of state-regulated foster parents."  *Nicini v. Morra*, 212 F3d 798, 807 (3rd Cir 2000), citing *Lintz v. Skipski*, 25 F3d 304, 305 (6th Cir 1994); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F2d 289, 293 (8th Cir 1993); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F2d 883, 891-93 (10th Cir 1992); *K.H. v. Morgan*, 914 F2d 846, 848-49 (7th Cir 1990); *Taylor v. Ledbetter*, 818 F2d 791 (11th Cir 1987) (*en banc*), *cert denied*, 489 US 1065 (1989); *Doe v. New York City Dep't of Social Servs.*, 649 F2d 134 (2nd Cir 1981), *cert denied*, 464  US 864 (1983).

The Third Circuit identified this right under the "special relationship" exception to *DeShaney*:

> when the state places a child in state-regulated foster care, the state has
> entered into a special relationship with that child which imposes upon it
> certain affirmative duties.  The failure to perform such duties can give
> rise, under sufficiently culpable circumstances, to liability under section
> 1983.

*Nicini*, 212 F3d at 808.

Thus, the plaintiff could state a claim under the due process clause for violation of his right to be free from harm by showing that the social worker was deliberately indifferent in conducting its investigation of a foster home where the child was to be placed.  *Id* at 811.  The court ultimately found that "the record reveal[ed] little from which [the social worker] could have inferred that Nicini faced a 'substantial risk of serious harm'" in his foster home placement.  *Id* at 813, quoting *Farmer v. Brennen*, 511 US 825, 837 (1994).  As a result, the court held that "a jury could not permissibly conclude that [the social worker's] investigation was so inadequate as to manifest deliberate indifference to [the plaintiff's] rights."  *Id* at 814.

The Seventh Circuit also imposed this duty by analogizing the child custody arena to that of state-imposed incarcerations:  "Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances when he was free."  *Morgan*, 914 F2d at 849.  Relying, in part, on *Morgan*, the Eighth Circuit in *Norfleet*, concluded that the state has "an obligation to provide adequate medical care, protection and supervision" to a child placed into foster care, which was protected by the Fourteenth Amendment.  *Norfleet*, 989 F2d at 293.

Although the Ninth Circuit has not addressed this precise issue, this court finds the reasoning of these cases persuasive and concludes that the constitutional right to personal safety and security applies to children placed in state-regulated foster care.  *See Lum v. Jensen*, 876 F2d

1385, 1387 (9th Cir 1989) (stating that for a qualified immunity analysis, "[a]bsent binding precedent, [this Court] look[s] to all available decisional law including the law of other circuits and district courts, to determine whether the right was clearly established."), *cert denied*, 493 US 1057 (1990). When social workers and local officials remove a child from his home, they eliminate his access to his ordinary channels for safety, security, and sustenance. By doing so they create a special relationship with the child which carries an affirmative obligation to ensure the safety and welfare of the child, including providing adequate medical care, during the placement.

The second step of the substantive due process analysis is to determine what level of conduct by state actors is sufficient to amount to a violation of the recognized constitutional right. *See L.W. v. Grubbs*, 92 F3d 894, 896 (9th Cir 1996) ("*Grubbs II*"). The parties mistakenly argue that the choice for this court is between a "shocks the conscience" standard or a lesser "deliberate indifference" standard. As recently pointed out by the Ninth Circuit, "the latter is one subset of the former." *Porter v. Osborn*, 546 F3d 1131, 1137 (9th Cir 2008). The Supreme Court has court emphasized that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *County of Sacramento v. Lewis*, 523 US 833, 846 (1998) (citation omitted). Thus, "[t]o this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* The Ninth Circuit has acknowledged the Supreme Court's clarion call "that only official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter*, 546 F3d at 1137,[9] citing *Lewis*,

---

[9]  This seemingly runs counter to *Grubbs II* where the court addressed the standard in the context of a prison employee suing her employer for injuries she sustained at the hands of prisoners. In deciding the standard of culpability that should apply in such a case, the court decided not to "add[] a requirement that the conscience of the federal judiciary be shocked by deliberate indifference, because the use of such subjective epithets as 'gross' 'reckless' and 'shocking' sheds more heat than light on the

(continued...)

523 US at 846.  While this overarching standard is constant, the standard of culpability by which

a court measures the effect the defendant's actions on its conscience varies depending upon the

setting in which the conduct occurs.  *Lewis*, 523 US at 850.

In this highly contextual analysis, the Supreme Court has emphasized the importance of

the time available for deliberation.  *See Porter*, 546 F3d at 1138-39.  Where the choice made by

the official occurs in emergency or rapidly developing circumstances, the court has applied a

"purpose to harm" test.  *Id*.  This effectively requires the official to intend to harm the plaintiff

for some reason other than one justified by a legitimate government purpose.  *Id*.  Where the

official acts under circumstances allowing for time for reflection, courts have imposed the lower

standard of culpability of deliberate indifference.  *Id* at 1139; *Gibson v. County of Washoe, Nev*.

290 F3d 1175, 1187 (9th Cir 2002) (applying deliberate indifference standard in the context of

providing medical care to pre-trial detainees), *cert denied*, 537 US 1106 (2003); *Lee v. City of

Los Angeles*, 250 F3d 668, 684 (9th Cir 2001) (applying deliberate indifference standard where

police had ample time to correct their obviously mistaken detention of the wrong person).

The decision to place Troy Jr. into foster care allowed some time for reflection and

investigation.  While the choice to remove Troy Jr. from the home arguably was made under

more rushed circumstances, there is no evidence that Almberg was under significant time

pressure to choose where to place Troy Jr.  In addition, the duty to provide medical care to Troy

Jr. while in foster care (state custody) is closely analogous to the duty state officials have toward

pre-trial detainees which is judged under a  deliberate indifference standard.  *Gibson*, 290 F3d at

---

[9](...continued)
thought process the courts must undertake in cases of this kind."  92 F3d at 900.  While this court agrees with this sentiment, it
will follow the nomenclature set down by the Supreme Court, as recognized by *Porter*, in conducting its analysis.

1187.  Courts that have directly addressed substantive due process in the foster care setting have

adopted deliberate indifference as the standard of culpability.  *See Nicini*, 212 F3d at 811; *White*

*v. Chambliss*, 112 F3d 731, 737 (4th Cir), *cert denied*, 522 US 913 (1997); *Taylor*, 818 F2d at

796; *Doe*, 649 F2d at 145.

The phrasing of the deliberate indifference standard is dependant upon the alleged action

or inaction.  With respect to her decision to place Troy Jr. with a particular foster family, the

standard is most closely related to that developed under the danger-creation cases, namely,

acting with deliberate indifference to known or obvious dangers to Troy Jr.'s well-being.  *See*

*Grubbs II*, 92 F3d at 900.  In comparison, borrowing from the context of state imposed

institutionalization, to be liable for providing inadequate medical care to Troy Jr., Almberg must

have known of and disregarded an excessive risk to Troy Jr.'s heath and safety.  *See Gibson*, 290

F3d at 1187.  While these standards were developed in different contexts, they are sufficiently

analogous to provide an adequate floor for judging Almberg's actions in this case.

### b.    <u>Analysis</u>

Almberg argues that there is no evidence that her actions exposed Troy Jr. to a known or

obvious danger, that she acted with deliberate indifference to that danger, or that she knew of or

ignored an excessive risk to Troy Jr.'s health or safety.  First, she asserts there is no evidence

that Troy Jr. suffered abuse while in foster care, and when the Hudsons expressed their concern

about bruising on Troy Jr.'s body, she immediately conducted an investigation which satisfied

her that no abuse had occurred.   Second, although Troy Jr. lost a small amount of weight while

in foster care, Almberg tried to get him to eat by contacting the Hudsons to obtain a list of his

usual foods and relayed that information to his foster parents.  Even though he had trouble

eating, he lost only one pound, or 3% of his body weight, while in foster care.  Third, while Almberg admits she did not take Troy Jr. to the follow-up visit recommended by the doctor, she argues there is no evidence that the doctor actually relayed the requirement of a follow-up appointment to her or that missing the appointment caused any harm to Troy Jr.  After being returned to the Hudsons, Troy Jr.'s physician did not note any health problems or signs of abuse which resulted from his time in foster care as distinct from the common ailments that may affect a child.  *See* Von Ter Stegge Aff., Ex. B, pp. 1-2.

///

The Hudsons counter that the failure to take Troy Jr. to a follow-up appointment within 10 days per the doctor's instruction is *per force* deliberate indifference.  They cite his improperly treated ear infection as the likely cause of his inability to eat and other emotional problems while in foster care.  Furthermore, they find an issue of fact with respect to Troy Jr.'s alleged abuse because the Hudsons and their doctor noted four bruises while Almberg observed only one.

The Hudsons' arguments are unpersuasive.  Even assuming that Almberg was notified that Troy Jr. needed to be taken to a follow-up doctors appointment in 10 days and that this failure contributed to his illness and emotional suffering while in foster care, this is insufficient to establish a claim for deliberate indifference.  At best, Almberg was negligent in failing to ensure Troy Jr. went to his follow-up appointment.  The Hudsons have produced no evidence showing that Troy Jr. suffered further complications or an extended length of sickness due to the lack of a follow-up visit.  To find that Troy Jr. suffered further injury *because* of Almberg's failure to follow the emergency room doctor's recommendation would be pure speculation.

Additionally, there is no evidence that this caused him any additional harm or that it prolonged an illness that predated his removal from the home.  The state defendants admit that Troy Jr. suffered a lack of appetite and other ailments while separated from his family and do not deny that he had a difficult time in foster care.  But no evidence reveals that any of this was due to the failure of Almburg to assure Troy Jr.'s personal safety or security while in foster care.  Finally, the number of bruises Troy Jr. had is irrelevant given that the Hudsons' doctor determined them not to be the result of abuse.

Due to the lack of any evidence that Troy Jr. would be, or in fact was, exposed to any danger while in foster care, or that Almberg disregarded an *excessive* risk to Troy Jr.'s health or security, no reasonable jury could find that Almberg was deliberately indifferent to a known or obvious danger in placing the chid in Foster care.  Nothing about Almberg's actions demonstrates deliberate indifference or, for that matter, shocks the conscience.  Thus, the Hudsons have established no constitutional violation with respect to Troy Jr.'s treatment while in foster care, entitling Almberg to summary judgment against Count 1 of the First Claim.

## ORDER

The city defendants' Motion for Summary Judgment (docket # 43) is GRANTED as to all claims except the following:

1.  Third Claim (failure to provide medial care to Mrs. Hudson), Count 3 (negligence) against all city defendants;

2.  Fourth Claim (excessive force used against Mr. Hudson), Count 1 (§ 1983) against Officer Bale and Officer Moffit and Counts 3 (negligence) and 4 (battery) against the City of Salem, Officer Bales and Officer Moffit; and

3. Sixth Claim (false arrest of Mr. Hudson), Count 1 (§ 1983) against Detective Wiltse, Officer Bales, and Officer Moffit.

The state defendants' Motion for Summary Judgment (docket #48) is GRANTED as to all claims except the Second Claim (interference with familial relations), Count 1 (§ 1983) against Almberg.

All other claims are dismissed with prejudice.

DATED this 1ˢᵗ day of May, 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge